OPINION
{¶ 1} Defendant-appellant, Martin Lawhorn (hereinafter "Lawhorn"), appeals the judgment of the Paulding County Court of Common Pleas finding him guilty of two counts of Breaking and Entering and two counts of Theft.
 {¶ 2} The charges against Lawhorn stem from two separate thefts, one occurring July 5, 2001 (hereinafter "Moore theft") and the other occurring June 25, 2004 (hereinafter "Lockie theft"). Although Lawhorn presented his two convictions to this court as separate appeals, we have elected to combine the appeals and render a single opinion.
 {¶ 3} On July 5, 2001, the Village of Oakwood Police Department received a call from Bruce Moore who stated that he had just returned from vacation and his garage had been broken into while he was gone. Moore reported that many tools and antiques were missing.[1] At the time of the theft, Lawhorn was Moore's next-door neighbor.
 {¶ 4} Approximately fifteen months after the theft from Moore's garage, Moore's son-in-law, Bill Vance, located sleigh runners reportedly belonging to Moore that had been in the garage when the theft occurred. The runners were in the possession of a local auctioneer who stated that he purchased the runners from Lawhorn. No other items belonging to Moore were ever located.
 {¶ 5} Following a lengthy investigation into the Moore theft, Lawhorn was arrested and subsequently indicted on January 12, 2004 on one count of Breaking and Entering and one count of Theft. He entered pleas of not guilty and was released on a recognizance bond on February 27, 2004.
 {¶ 6} Approximately four months after Lawhorn was released on bond, items were stolen from a barn in Paulding County. On June 25, 2004, at approximately 9:30 p.m., the Paulding County Sheriff's Office responded to a call from Deb Lockie who reported that she and her son, Jonathan, had just returned to their rental property and discovered a truck parked adjacent to the pole barn on the premises. Deb was able to write down the license plate number of the truck while Jonathan approached the man near the truck and asked him what he was doing. While talking to the man, Jonathan noticed that items previously inside the pole barn were in the back of the truck. The man apologized and left abruptly.
 {¶ 7} After reporting the incident to the police and supplying the license plate number, Jonathan and Deb were shown a series of photo line-ups and identified Lawhorn as the man they interacted with on the night of June 25, 2004. None of the missing items from the Lockies' barn were ever recovered.
 {¶ 8} As a result of witness identification, Lawhorn was arrested. On July 16, 2004, Lawhorn was indicted for the Lockie theft on one count of Breaking and Entering and one count of Theft. He entered pleas of not guilty to both charges.
 {¶ 9} On October 19, 2004, the prosecution filed a motion for joinder of indictments for trial, which was unopposed by Lawhorn. A jury trial proceeded on October 26 and 27, 2004. Following the presentation of evidence, Lawhorn was found guilty of the Moore theft on one count of Breaking and Entering, in violation of R.C.2911.13(A), a felony of the fifth degree and one count of Theft, in violation of R.C. 2913.02, a first degree misdemeanor. Lawhorn was also found guilty of the Lockie theft on one count of Breaking and Entering, in violation of R.C. 2911.13(A) and one count of Theft, in violation of R.C. 2913.02, both felonies of the fifth degree.
 {¶ 10} Sentencing proceeded on December 16, 2004. For the Moore theft, Lawhorn was sentenced to serve a prison term of eleven months for Breaking and Entering and six months for Theft, to be served concurrently. For the Lockie theft, he was sentenced to serve a prison term of eleven months for Breaking and Entering and eleven months for Theft, to be served concurrently. The trial court further ordered that the sentences in each of the two cases be served consecutively, resulting in an aggregate prison term of twenty-two months.
 {¶ 11} It is from his conviction and sentence that Lawhorn now appeals and sets forth three assignments of error for our review.
 ASSIGNMENT OF ERROR NO. I The jury verdict is not supported by sufficient evidence andis against the manifest weight of the evidence.
 {¶ 12} In this assignment of error, Lawhorn attacks both the legal sufficiency and manifest weight of the evidence with regard to the four charges upon which he was convicted: breaking and entering and theft in connection with the Moore theft and breaking and entering and theft in connection with the Lockie theft.
 {¶ 13} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks
(1981), 61 Ohio St.3d 259. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. at paragraph two of the syllabus.
 {¶ 14} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. Statev. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citingState v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the demeanor of the witnesses and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230.
I. Moore theft
 {¶ 15} Regarding the breaking and entering and theft from Moore's garage on July 5, 2001, Lawhorn contends that there was no evidence that he committed a theft offense, directing us to consider his explanation at trial that he purchased the sleigh runners from someone else. In addition, Lawhorn asserts that no evidence was presented he ever entered Moore's garage. In fact, Lawhorn argues that various witnesses testified that he was somewhere else when the theft occurred.
 {¶ 16} Lawhorn was convicted on one count of Breaking and Entering, in violation of R.C. 2911.13(A), which provides that: "No person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in [R.C. 2913.01], or any felony." Lawhorn was also convicted of one count of Theft, requiring the state to prove that Lawhorn "with purpose to deprive the owner of property or services," knowingly obtained the property of Moore without his consent. See R.C. 2913.02.
 {¶ 17} At trial, evidence was introduced that Lawhorn volunteered a DNA sample to the police. The police subsequently tested three beer bottles, which were recovered from Moore's garage on the night of July 5, 2001, against Lawhorn's sample. The test result indicated that the DNA profile from the bottles was consistent with the DNA profile of Lawhorn. The laboratory further indicated that the frequency of occurrence of the DNA profile on the beer bottles was one in 86,510,000,000,000,000 individuals. Moore testified that he was in the garage every day and that those beer bottles had not been his and should not have been there. He further stated that he never had Lawhorn into his garage to drink beer. Moore also testified that he did not give Lawhorn permission to take items from his garage.
 {¶ 18} In contrast, Lawhorn testified that the beer bottles with his DNA were present because he had been to Moore's garage several times and drank beer there with Moore. With regard to the theft, Lawhorn stated that due to problems with his back, there was no way that he could have gotten in the garage through the point of entry, a window that was two to three feet off the ground. His doctor, Joseph Kraska, also opined that it would be difficult for Lawhorn, with his mobility limited by back problems, to climb through a window at that height.
 {¶ 19} Regarding the sale of the sleigh runners, Lawhorn did not deny that, indeed, he sold them to the auctioneer. However, Lawhorn testified that he bought the runners from another antique dealer who had since passed away, but he did not receive a receipt for the purchase.
 {¶ 20} Additionally, Lawhorn presented the testimony of his wife and his mother. Lawhorn's mother testified that around the time of the break-in at Moore's garage, Lawhorn's father was critically ill in the hospital. She stated that Lawhorn stayed with his father during that time all day and all night and left only to change clothes. She was not sure, however, whether Lawhorn's father was in the hospital on the particular day the items were taken from Moore's garage. Lawhorn's wife testified that Lawhorn's father was in the hospital on the day of the break-in and that Lawhorn was at the hospital with the family.
 {¶ 21} After reviewing the evidence presented in connection with the Moore theft, we find that the DNA evidence established that Lawhorn had been inside Moore's garage. In addition, the state presented testimony from a local auctioneer who stated he had purchased sleigh runners from Lawhorn. The sleigh runners were identified as being in Moore's garage at the time of the theft. Moreover, the state provided evidence that Lawhorn did not have Moore's permission to enter his garage or take items therein. Although the evidence against Lawhorn may have been circumstantial in nature, it is widely accepted that circumstantial and direct evidence have the same probative value. See Jenks, supra, paragraph one of the syllabus. Viewing the evidence presented in a light most favorable to the prosecution, we find that a rational trier of fact could be convinced of Lawhorn's guilt beyond a reasonable doubt. Accordingly, we do not find that the jury verdict was based on insufficient evidence.
 {¶ 22} Additionally, although Lawhorn and his family provided alibi testimony and he presented evidence that his physical limitations would prevent him from entering Moore's garage in the manner that it was broken into, the jury found the state's evidence to be more credible. We cannot find that, in doing so, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed.
II. Lockie theft
 {¶ 23} In addition to his claimed error with regard to the theft from Moore's garage, Lawhorn claims that his convictions for breaking and entering and theft from the Lockies' barn were against the manifest weight of the evidence and that the evidence was insufficient to find his guilt beyond a reasonable doubt.
 {¶ 24} Specifically, Lawhorn asserts that the testimony from his doctor illustrated that he could not have lifted the items that were stolen from the Lockies, as at least one of the items weighed more than 50 pounds. Lawhorn also contends that his identification by the Lockies was tainted because it was getting dark when the Lockies saw him and he bears a striking resemblance to his brothers. Finally, Lawhorn argues that the jury disregarded his explanation as to why he was on the Lockies' property.
 {¶ 25} Lawhorn was convicted on one count of Breaking and Entering, in violation of R.C. 2911.13(A) and one count of Theft, in violation of R.C. 2913.02. These are the same statutes he was charged with violating in the Moore theft. Therefore, the state was required to meet the same burden of proof in each case.
 {¶ 26} At trial, Deb Lockie testified that as she and her son drove past their rental property, they noticed a truck backed up to the barn. Deb stated that she wrote down the license plate while Jonathan got out to talk to the man in the truck, who Deb described as being in his 40s or 50s, approximately six feet tall, with a pocked face and two missing front teeth.
 {¶ 27} The man identified himself to the Lockies as Rick Lawson and said that he was picking up some clothes for one of his friends. As the man spoke, Jonathan looked through the back of the truck and noticed that it contained items from the barn, including a motor, a case of antifreeze, vases and chairs, but no clothes.[2] Before the Lockies could get any more information, however, the man apologized and drove away.
 {¶ 28} Deputy Gary Dietrick testified that he received a call from Deb Lockie on June 25, 2004, and she reported that she and her son had just caught someone stealing things from their barn. Dietrick ran the license plate that Deb had provided and discovered it was registered to Shawn Lawhorn, the defendant's son. Realizing that Shawn Lawhorn did not match Deb's description of the man she had encountered, Dietrick testified that he pulled up Lawhorn's driver's license. The next day, Dietrick had two different photo line-ups put together, one of which included Lawhorn. From the photos they were shown, both Deb and Jonathan picked out Lawhorn as the man who had been at the barn the previous night. Deb stated that Lawhorn had not had permission to take items from their barn.
 {¶ 29} Lawhorn testified that he did stop at the Lockies' property on the night of June 25, 2004, but he did not know whose property it was. Lawhorn testified that he needed to use the restroom and he backed his truck off the road. He stated that Deb Lockie was upset when she saw him urinating on the property and that he apologized and drove away.
 {¶ 30} After review, we find that the evidence presented by the state would convince the average mind of the defendant's guilt beyond a reasonable doubt as to these two offenses. The state introduced the testimony of Deb and Jonathan Lockie, who both stated that Lawhorn was the man they encountered at their barn on the night of June 25, 2004 and Jonathan Lockie stated that he saw items from the pole barn inside the truck Lawhorn was driving. Moreover, the license plate number of the truck that Deb wrote down that night was discovered to be registered to Lawhorn's son. Thus, we do not find that Lawhorn's convictions were based on insufficient evidence.
 {¶ 31} With regard to the manifest weight of the evidence, once again, although Lawhorn presented evidence in opposition to the state's evidence, the jury found the state's witnesses to be more credible. Giving deference to the trier of fact regarding the weight of the evidence and the credibility of the witnesses, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed. Therefore, we hold that the jury's decision was not against the manifest weight of the evidence.
 {¶ 32} Lawhorn's first assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. II The trial court committed an error of law by denyingAppellant's Crim.R. 33 motion for new trial on the basis ofineffective assistance of counsel.
 {¶ 33} In this assignment of error, Lawhorn alleges that his counsel was ineffective in failing to challenge the prosecution's request for consolidation of the indictments for trial. In addition, Lawhorn asserts his counsel was ineffective in failing to subpoena Lawhorn's brother at his proper address in order to substantiate Lawhorn's alibi testimony.
 {¶ 34} To establish a claim of ineffective assistance of counsel, appellant must show two components: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defense. State v. Kole (2001), 92 Ohio St.3d 303, 306;Strickland v. Washington (1984), 466 U.S. 668.
 {¶ 35} To prevail on an ineffective assistance claim in a case involving a failure to make a motion on behalf of the defendant or oppose a motion by the state, the defendant is required to show: (1) that the motion or opposition thereto was meritorious, and (2) that there was a reasonable probability that the verdict would have been different had the motion been made or opposed. State v. Santana (2001), 90 Ohio St.3d 513; State v.Lott (1990), 51 Ohio St.3d 160.
 {¶ 36} The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged "are of the same or similar character." A defendant challenging joinder has the burden of affirmatively showing that his rights would be prejudiced if the offenses were consolidated for trial. See Crim.R. 14.
 {¶ 37} In the case sub judice, we find that the jury could clearly differentiate the evidence of the two offenses with which Lawhorn was charged. The two offenses took place three years apart, in different locations, with different victims, were committed in a different manner and were proven with different witnesses and evidence. Therefore, we cannot find that Lawhorn was prejudiced by the consolidation of the indictments. Accordingly, a motion to oppose joinder would have had no merit.
 {¶ 38} Even if trial counsel would have opposed joinder, we do not find that the result of the proceedings would have been different. Although it cannot be discerned on this record why trial counsel did not oppose joinder, or subsequently seek a severance, many legitimate strategies could justify this position. For instance, a single trial is often preferable to the "harassment, delay, trauma and expense of multiple prosecutions."State v. Schaim (1992), 65 Ohio St.3d 51, 58. If defense counsel had opposed joinder or subsequently moved for severance, Lawhorn has offered no evidence that the trial court would not have been well within its discretion in maintaining the joinder. Therefore, we cannot find that Lawhorn received ineffective assistance for counsel's failure to oppose the prosecution's motion for consolidation of indictments.
 {¶ 39} We also cannot find that Lawhorn received ineffective assistance of counsel for the failure to subpoena Lawhorn's brother at his correct address. Lawhorn's mother and wife testified as to Lawhorn's presence in the hospital room with his father during the time the theft from Moore's garage was alleged to have taken place. The testimony of Lawhorn's brother would have been merely cumulative to the testimony already presented to the jury.
 {¶ 40} Accordingly, Lawhorn's second assignment of error is hereby overruled.
ASSIGNMENT OF ERROR NO. III
 The trial court commited [sic] an error of law by imposing aconsecutive sentence.
 {¶ 41} In his final assignment of error, Lawhorn asserts that the trial court erred by imposing consecutive eleven-month sentences, for an aggregate term of twenty-two months. Lawhorn asserts that the trial court merely recited the statutory factors, without setting forth reasons in support of its conclusions.
 {¶ 42} In reviewing a felony sentence, an "appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing" if it finds, by clear and convincing evidence, that the record does not support the sentencing court's findings or is otherwise contrary to law. See R.C. 2953.08(G)(2). Moreover, the trial court is in the best position to make the fact-intensive evaluations required by the sentencing statutes as the trial court has the best opportunity to examine the demeanor of the defendant and evaluate the impact of the crime on the victim and society. State v.Martin (1999), 136 Ohio App.3d 355, 361.
 {¶ 43} Before consecutive sentences may be imposed, the trial court is required to make several findings in accordance with R.C. 2929.14 and R.C. 2929.19. First, the sentencing court must find that consecutive sentences are "necessary to protect the public" or to "punish the offender." R.C. 2929.14(E)(4). Second, the court must find that consecutive sentences are "not disproportionate to the seriousness of the offender's conduct and to the danger he poses to the public." Id. Finally, the trial court must find the existence of one of the three following circumstances:
(a) the offender committed one or more of the multipleoffenses while the offender was awaiting trial or sentencing* * * or was under post-release control for a prior offense;
 (b) * * * the harm caused by * * * the multiple offenses wasso great or unusual that no single prison term for any of theoffenses committed as part of a single course of conductadequately reflects the seriousness of the offender's conduct;
(c) the offender's history of criminal conduct demonstratesthat consecutive sentences are necessary to protect the publicfrom future crime by the offender. R.C. 2929.14(E)(4).
 {¶ 44} In addition to these findings, the trial court must give its reasons for imposing consecutive sentences. See R.C.2929.19(B)(2)(c). Therefore, the trial court must not only make the required findings under R.C. 2929.14(E)(4), but must also substantiate those findings, on the record, by "identifying specific reasons supporting the imposition of consecutive sentences." State v. Brice (March 29, 2000), 4th Dist. No. 99CA24.
 {¶ 45} Lawhorn does not dispute that the trial court made the required findings. However, Lawhorn argues that the findings were not supported by adequate reasons. Therefore, we will limit our review to this issue.
 {¶ 46} At sentencing, the trial court discussed Lawhorn's lengthy prior criminal history, which included a prior conviction for breaking and entering, and determined that he was likely to commit future crime. Moreover, the trial court noted that Lawhorn failed to take responsibility for his actions, noting that Lawhorn "continues to deny his involvement although the jury has convicted him of all of these offenses." The trial court also stated that it was significant that Lawhorn committed the Lockie theft while he was out on bond from the Moore theft.
 {¶ 47} After review, we find that the trial court substantiated its findings with adequate reasons, including Lawhorn's criminal history and his commission of one offense while out on a recognizance bond for another offense. Therefore, we do not find the trial court erred in ordering Lawhorn's two sentences be served consecutively.
 {¶ 48} Lawhorn's third assignment of error is overruled.
 {¶ 49} Having found no error prejudicial to appellant herein, in the particulars assigned and argued, we affirm the judgments of the trial court.
Judgments Affirmed.
 Bryant and Shaw, J.J., concur.
[1] The value of Moore's loss was later determined to be approximately $4702.11.
[2] The Lockies' loss was later determined to be approximately $5,968.13.