OPINION
{¶ 1} This is an appeal by defendant-appellant, Jerome C. Peterson, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which appellant was found guilty of murder, aggravated burglary, aggravated robbery and participating in a criminal gang.
 {¶ 2} On January 27, 2005, appellant was indicted on one count of murder, in violation of R.C. 2903.02, one count of aggravated burglary, in violation of R.C. 2911.11, one count of aggravated robbery, in violation of R.C. 2911.01, one count of having a *Page 2 
weapon while under disability, in violation of R.C. 2923.13, and one count of participating in a criminal gang, in violation of R.C. 2923.42. The counts charging appellant with murder, aggravated burglary and aggravated robbery each carried firearm and gang specifications. The indictment arose out of the shooting death of James Goins on November 9, 2004.
 {¶ 3} The matter came for trial before a jury beginning November 13, 2006. The state presented evidence that, on November 9, 2004, at approximately 11:00 p.m., Columbus police officers responded to a reported shooting at an apartment located at 3132 Easthaven Drive, Columbus. The shooting victim, a black male subsequently identified as James Goins, was lying on the ground outside the apartment, approximately two feet from the door. Goins had suffered a gunshot wound to the back of the head, and medical personnel declared him dead at the scene.
 {¶ 4} Tyrone Payne, who was with Goins on the night of the shooting, testified on behalf of the state and gave the following account of the events. In November 2004, Payne, who admitted to a history of selling drugs, was working as a confidential informant in conjunction with the Franklin County Sheriff's Office. Payne was acquainted with Goins, as the two had been involved in past drug transactions. On November 9, 2004, Goins contacted Payne about some cocaine and marijuana Goins recently obtained. Payne, in turn, contacted Franklin County Sheriff Detective Anne Durbin, and gave this information to the detective.
 {¶ 5} Payne and appellant were acquainted, having grown up in the same neighborhood. Payne testified that appellant was a member of the "Bloods" gang, which also went by the names "22nd" and "Deuce Deuce." (Tr. Vol. II, at 394.) After speaking *Page 3 
with Goins, Payne contacted appellant and offered to sell him some marijuana. Appellant asked Payne if he had "contacts," and Payne responded, "Yes, I am going to see some right now." (Tr. Vol. II, at 336.)
 {¶ 6} Later that day, appellant and two other men, later identified as Reginald Perry and Justin King, drove to Payne's residence. According to Payne, appellant "wanted the weed, and there was another guy who was talking about dope." (Tr. Vol. II, at 338.) Payne indicated that "my friend had some now." (Tr. Vol. II, at 338.) One of the men stated, "He [Goins] is spoon fed, so can we hit him?" (Tr. Vol. II, at 339.) Payne responded, "Nah, man, it ain't no need." (Tr. Vol. II, at 340.) Payne explained during his testimony that the term "spoon fed" meant that someone "is just an average person that has somebody behind him that has a ton of dope that is just handing it to him." (Tr. Vol. II, at 339.) The term "hit him" was used to mean "[c]ould he rob him." (Tr. Vol. II, at 340.)
 {¶ 7} Goins lived on the north side of Columbus, but he used a different location, an apartment on Easthaven Drive, for drug transactions. Payne and Goins made arrangements whereby Goins would drive to his apartment and then call Payne. That evening, at approximately 8:00 p.m., Payne, appellant, and the other two men (Perry and King) were at the Aquarium Café, located on Brice Road. Payne and Goins spoke by phone, and Payne informed Goins he would be coming over to the apartment.
 {¶ 8} Around 9:00 p.m., Payne drove to the apartment in his vehicle, while appellant and the other two men drove there in a maroon vehicle. Payne planned to initially go inside the apartment alone and "okay it" by Goins; Payne would then bring out a sample and introduce Goins to appellant and the others. (Tr. Vol. II, at 349.) *Page 4 
 {¶ 9} Payne knocked on the apartment door and Goins let him inside. Goins, who owed Payne money, gave Payne some marijuana. Payne then told Goins that "my cuz wanted to see some dope and is it cool." (Tr. Vol. II, at 351.) Goins responded that it "was cool and the dope was on the counter." (Tr. Vol. II, at 352.)
 {¶ 10} Payne put some cocaine in his pocket to take outside to show appellant; however, as Payne was heading toward the door, appellant and one of the men, described as "the light-skinned guy," burst inside the apartment. (Tr. Vol. II, at 354.) The light-skinned individual was holding a handgun, and said "[s]hut the fuck up." (Tr. Vol. II, at 357.) As appellant entered the apartment, he grabbed a wooden baseball bat and pointed it at Goins, who was sitting on a couch in the living room. Goins initially stood up and "charged" toward the gun, but the light-skinned individual stepped back and pointed the gun at Goins. (Tr. Vol. II, at 359.) Goins then said, "[d]on't shoot," and he informed them that "the dope is on the counter." (Tr. Vol. II, at 359.)
 {¶ 11} Payne asked appellant, "[w]hat is going on?" (Tr. Vol. II, at 361.) Payne and appellant got into an argument, cussing at each other. The light-skinned man then told Payne to "get face down on the floor." (Tr. Vol. II, at 362.) Payne got down on the floor, and appellant continued to point the baseball bat at Goins, holding him on the couch. The light-skinned individual then went into the kitchen, and at that time Goins "bolts for the door." (Tr. Vol. II, at 365.) Appellant tried to keep Goins "between him and the door," but Goins managed to reach the door. (Tr. Vol. II, at 366.) At that time, "the light-skinned guy comes flying out of the kitchen and they're all three outside the door," and Payne then heard the sound of a shot. (Tr. Vol. II, at 366.) *Page 5 
 {¶ 12} After hearing the shot, Payne went to the back of the kitchen and stood behind a wall in order to give himself a chance to escape. Payne was terrified, and he remained there until he heard the squeal of car tires. Payne then ran outside and observed Goins lying unresponsive at the side of the front porch.
 {¶ 13} Payne went back inside the apartment to look for his cell phone, but he was unable to locate it. He then drove to Kensington Common Apartments where he called Detective Durbin and said, "I think somebody got shot." (Tr. Vol. II, at 373.) After talking to the detective, Payne drove back to the scene. Payne then returned to the Kensington Common Apartments and called Detective Durbin again, telling the detective "he was okay or something to that effect." (Tr. Vol. II, at 375.) Payne stated he lied to the detective because he was scared. Payne then called a friend, and the friend eventually phoned 911 to report the shooting.
 {¶ 14} Later that evening, Payne used a phone to dial his cell phone number. Appellant answered and said, "Fuck that, nigger." (Tr. Vol. II, at 376.) Appellant asked Payne if he had "talked to the cops." (Tr. Vol. II, at 377.) Payne, who was afraid, told him "no." (Tr. Vol. II, at 377.) Appellant told Payne "he didn't know what was up with the light-skinned guy, what he was on or what[.]" (Tr. Vol. II, at 378.) Payne agreed to meet appellant back at the Aquarium Café. According to Payne, he returned to the club because he was scared and "was trying to ease it to him [appellant] that I was cool." (Tr. Vol. II, at 378.) Payne spoke with appellant in the parking lot of the nightclub, and appellant informed Payne "[t]hey got six ounces." (Tr. Vol. II, at 380.) Appellant wanted to give Payne three ounces but Payne refused, telling appellant he had taken some of the drugs "they forgot." (Tr. Vol. II, at 381.) Payne lied about taking drugs from the *Page 6 
apartment because he "didn't want any part of it." (Tr. Vol. II, at 381.) Payne then drove home.
 {¶ 15} The next day, appellant came to Payne's house and offered Payne $10,000 not to talk to the police. Payne told appellant, "no, I am cool, he didn't have to worry about it." (Tr. Vol. II, at 383.) That day, however, Payne contacted police detectives. Payne initially minimized his role in the events, telling the detectives he was not inside the apartment but, rather, had remained outside in his car. Later, Payne contacted the detectives and told them he knew one of the individuals involved in the shooting, but not the other two men. Payne gave appellant's name and nickname, "E," to the detectives. (Tr. Vol. II, at 386.) During this second conversation, Payne told the detectives everything that had happened.
 {¶ 16} Approximately one month after the incident, police officers showed Payne a photo array, and he chose an individual from the array who appeared to be the light-skinned individual. It was stipulated at trial that this individual was Reginald Perry. Payne also picked out an individual from a photo array who he identified as the dark-skinned individual, and it was stipulated at trial that this individual was Justin King.
 {¶ 17} King also testified on behalf of the state. King, who had entered into an agreement to plead to involuntary manslaughter in connection with the shooting of Goins, gave the following account of the events of November 9, 2004. That evening, King, appellant, and Perry were at the Aquarium Café. King was acquainted with appellant and Perry, as all three grew up in the same neighborhood. King met Payne for the first time that evening. *Page 7 
 {¶ 18} Later, King went with appellant, Perry and Payne to an address on Easthaven Drive. King drove in one car accompanied by appellant, while Payne and Perry were in another vehicle. King stated he went to the location because he was "asked to drive there" by Perry. (Tr. Vol. III, at 561.) King parked near the driveway of a residence. Appellant eventually got out of the car and walked up to the residence, while King remained inside the car. Appellant was standing near the porch for approximately ten seconds when King heard a loud noise. He got out of the car and began walking up to the garage door when he saw "this guy * * * come running out." (Tr. Vol. III, at 565.)
 {¶ 19} King then saw Perry running behind the fleeing man. As the man jumped off the porch steps, Perry fired a shot at him and the man fell immediately to the ground. Appellant, Perry and King then ran to King's car and King drove away, with Perry in the front passenger seat and appellant in the back seat. King observed a brown bag in Perry's hands. King later learned that Perry gave appellant half of the drugs to give to Payne.
 {¶ 20} King acknowledged driving to Easthaven Drive for "a drug deal." (Tr. Vol. III, at 572.) He denied, however, any knowledge that Goins would be robbed, indicating only that he "had a gut feeling." (Tr. Vol. III, at 598.) King also denied being a member of the Deuce Deuce Bloods gang. On cross-examination, King stated he was positive that appellant never went inside the residence that evening.
 {¶ 21} In 2005, Summer Booker resided at 2947 East Moreland with Reginald Perry. On January 19, 2005, police officers searched that residence and recovered a firearm. Booker testified that Perry and King were both members of the Bloods gang. *Page 8 
 {¶ 22} Mark Hardy, a criminalist with the Columbus Police Department, performed a laboratory examination of a .38 caliber revolver and a spent bullet fragment. Hardy opined that the bullet fragment was fired from the revolver which officers recovered from the residence at 2947 East Moreland.
 {¶ 23} Dr. Patrick Fardal performed an autopsy of the shooting victim. Hardy testified that Goins suffered a single gunshot wound to the back of the head; the bullet entered the victim's brain, causing almost immediate death.
 {¶ 24} Franklin County Common Pleas Judge Greg Peterson was called as a witness by the state. Peterson formerly served as a prosecutor with the Franklin County Prosecutor's Office, and, in that capacity, he participated in the investigation surrounding the shooting death of Goins. As part of that investigation, Peterson was involved in a proffer conversation with Justin King prior to the time a "defendant's agreement" was reached. (Tr. Vol. IV, at 666.) Peterson identified State's Exhibit O as the proffer letter, dated January 20, 2005, that both he and King had signed.
 {¶ 25} Peterson testified that, during the proffer conversation, King explained "from the very beginning that the purpose for going ultimately to Mr. Goins['] house was for a robbery." (Tr. Vol. IV, at 670.) King related he was contacted by Reginald Perry, who indicated he needed a driver to do "a lick," meaning a robbery. (Tr. Vol. IV, at 670.) King was initially reluctant, but told Perry to call him back if no one else was available. Perry later called him again. Appellant and another individual, "Jerome's cousin," who was later identified as Payne, were also involved. (Tr. Vol. IV, at 671.) The four men drove to some bars that evening, and the individual King identified as Jerome's cousin received a phone call from Goins. Arrangements were made for the men to go to Goins' apartment *Page 9 
"to presumably purchase drugs, but ultimately their intention was to commit a robbery." (Tr. Vol. IV, at 672.)
 {¶ 26} King indicated that Jerome's cousin pulled into the driveway of the apartment in an SUV, while King remained in the other vehicle. King initially told prosecutors he remained in the car and heard the sound of a gunshot, and that appellant and Perry came running back to the vehicle. King later explained that he had gotten out of his car and walked toward the apartment, but as he approached he heard a noise and then saw a man fleeing the residence with Perry behind him. King then heard a gunshot and saw Goins fall. According to Peterson, King did not initially admit he saw the shooting, "but ultimately he said he saw Mr. Perry with a black handgun in his hand, raise it, point it at Mr. Goins and pull the trigger." (Tr. IV, at 674.)
 {¶ 27} King stated during the proffer conversation that appellant and Perry both entered the house, that "the door had closed, and * * * some time * * * passed, and that is what motivated him to get out of the car and approach the apartment." (Tr. IV, at 674.) According to Peterson, "[f]rom the beginning of the proffer it was clear Justin admitted right out of the gate that their entire intention of this whole situation was for a robbery to occur." (Tr. IV, at 675.) King ultimately indicated that appellant "got a half of what they would refer to as the take[.]" (Tr. IV, at 675.)
 {¶ 28} Detective Patrick Brooks is a member of the Strategic Response Bureau of the Columbus Police Department, which is involved with monitoring gang-related activities. Detective Brooks testified that gang members can be identified by certain criteria, including tattoos, clothing, colors and association. The detective stated he was very familiar with the Deuce Deuce Bloods gang, and that there are over 100 members of *Page 10 
the gang in Columbus. He was also familiar with appellant, King and Perry, and the detective testified that all three individuals were members of the 22nd Street Bloods gang, as well as the Deuce Deuce Bloods.
 {¶ 29} Following deliberations, the jury returned verdicts finding appellant guilty of murder, aggravated burglary, aggravated robbery, and participating in a criminal gang. During a separate bench trial, the trial court found appellant guilty of the charge of having a weapon while under disability. The trial court sentenced appellant by judgment entry filed July 6, 2007.
 {¶ 30} On appeal, appellant sets forth the following four assignments of error for review:
 ASSIGNMENT OF ERROR NO. I:
 PROSECUTORIAL MISCONDUCT DEPRIVED JEROME PETERSON OF HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. FEDERAL CONSTITUTION AND ARTICLE I, § 2, 10, AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. II:
 THE TRIAL COURT ERRED IN PERMITTING THE STATE TO INTRODUCE IMPROPER AND PREJUDICIAL GANG TESTIMONY. AS A RESULT, THE TRIAL COURT VIOLATED PETERSON'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. FEDERAL CONSTITUTION AND ARTICLE I, § 2, 10, AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. III:
 THE REPRESENTATION PROVIDED TO JEROME PETERSON FELL FAR BELOW THE PREVAILING NORMS FOR COUNSEL IN A CRIMINAL CASE, WAS UNREASONABLE, AND AFFECTED THE OUTCOME IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND *Page 11 
FOURTEENTH AMENDMENTS AS WELL AS ART. I, § 2, 9, 10, AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. IV:
 THE TRIAL COURT ERRED IN ENTERING JUDGMENT AGAINST JEROME PETERSON SINCE THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. FEDERAL CONSTITUTION AND ARTICLE I, § 2, 10, AND 16 OF THE OHIO CONSTITUTION.
 {¶ 31} We will address appellant's first and second assignments of error in inverse order. Under his second assignment of error, appellant asserts the trial court erred in permitting the state to introduce testimony regarding purported gang-related activities. Appellant argues that Columbus Police Detective Patrick Brooks was not qualified to testify as a gang expert, and that his opinions were inadmissible under the requirements set forth in Daubert v. Merrell Dow Pharmaceuticals,Inc. (1993), 509 U.S. 579, 113 S.Ct. 2786. Appellant further argues that evidence of gang-related activity was irrelevant.
 {¶ 32} Appellant's reliance upon Daubert to exclude the testimony of Detective Brooks is unpersuasive, as the Ohio Supreme Court has rejected the view that "the Daubert factors (peer review, publication, potential error rate, etc.)" apply to gang-related testimony. State v.Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, at ¶ 119.
 {¶ 33} In Drummond, the appellant challenged the admissibility of expert testimony by a detective who described gang-related matters, including hand signs, tattoos, and a "gang book." Id., at ¶ 111. The detective in Drummond had worked in a gang unit for the Youngstown Police Department for several years, and had gained knowledge and experience "through investigating gang activity in the Youngstown area." Id., at ¶ 116. *Page 12 
The court found that the testimony of the witness demonstrated he had specialized knowledge concerning gang activities and matters. The Ohio Supreme Court also rejected the appellant's contention that the evidence was irrelevant, holding that the evidence of gang culture, symbols, hand gestures and traditions was relevant to the issue of motive in that case, as it "provided the jury with crucial background information in considering the evidence." Id., at ¶ 112.
 {¶ 34} In the instant case, Detective Brooks testified that he was a member of the department's Strategic Response Bureau ("bureau"), and that the bureau's duties include monitoring gang activity. The detective has previously been declared an expert in Franklin County in gang identification, and has attended numerous educational conferences concerning gangs and gang activity. Detective Brooks testified that he works on a daily basis with gangs, and has spent ten years investigating gang-related activity, including working with the "Bloods, Crips, motorcycle gangs, Nazis, Vinlanders, [and] Skinheads[.]" (Tr. Vol. IV, at 690.) Detective Brooks stated he was "[v]ery familiar" with the "Deuce Deuce Bloods," having dealt with them for ten years. (Tr. IV, at 702.) At trial, he discussed gang identification, noting how gangs differentiate themselves, and he listed various gang identification criteria, including clothing, colors, tattoos, association and self-admission.
 {¶ 35} Here, similar to the witness in Drummond, the testimony of Detective Brooks indicated "that he possessed specialized knowledge about gang symbols, cultures, and traditions beyond that of the trier of fact." Id., at ¶ 116. Further, as noted above, the Daubert factors are not dispositive as to an expert's qualification to testify regarding gang activity. Based upon a review of the record, we find no merit to *Page 13 
appellant's contention that Detective Brooks was not qualified as an expert in gang activity and gang identification.
 {¶ 36} We also find no merit to appellant's contention that the challenged evidence was irrelevant. In general, a trial court has discretion to determine whether evidence is relevant, and whether relevant evidence should be excluded. State v. Johnson, Summit App. No. 22688, 2006-Ohio-1313, at ¶ 23. A reviewing court will not reverse such a determination absent an abuse of discretion. Id.
 {¶ 37} As noted under the facts, appellant was charged with one count of participating in a criminal gang, in violation of R.C. 2923.42. Further, several of the other counts included gang specifications, which required the state to prove appellant "committed a felony that is an offense of violence while participating in a criminal gang." R.C. 2941.142. Therefore, evidence that appellant was a member of the Deuce Deuce gang was relevant to prove the elements of the above charge and specifications.
 {¶ 38} The evidence was also relevant to show the relationship between Perry, King and appellant, and to put the crimes in context.Drummond, supra, at ¶ 112 ("Gang affiliation can be relevant in cases in which the interrelationship between people is a central issue"). Here, the challenged testimony "provided the jury with crucial background information in considering the evidence," as it explained appellant's relationship with the other participants. Id. See, also, State v.Berry (June 29, 1999), Franklin App. No. 97AP-964 (references to gang activity relevant to provide background information as to how appellant and witness knew each other and to provide context regarding appellant's role in committing crime). Finally, the evidence was relevant to show a common purpose as appellant was prosecuted under a complicity theory.State v. Dawson (Dec. 11, 2001), *Page 14 
Franklin App. No. 00AP-1052 (evidence showing defendant's association with a street gang known as the "X Clan" was relevant to show common purpose where defendant was prosecuted under a complicity theory on charges of attempted murder).
 {¶ 39} Based upon the foregoing, appellant's second assignment of error is overruled.
 {¶ 40} Under his first assignment of error, appellant asserts he was denied a fair trial because of prosecutorial misconduct. Appellant argues that Payne gave testimony that was not credible, and that the state called King as a witness in an attempt to corroborate Payne's testimony. Appellant contends, however, that, when King's testimony did not support the state's theory, the state impermissibly attempted to bootstrap Payne's testimony through the testimony of former prosecutor Peterson. Appellant further argues that the testimony of Detective Brooks, regarding gang-related activities, was highly prejudicial. Appellant argues that the effect of the state presenting these witnesses was to call upon the jury to convict appellant based upon passions and prejudices rather than upon the evidence.
 {¶ 41} The Ohio Supreme Court has held that the "test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." State v. Davis, 116 Ohio St.3d 404, 2008-Ohio-2, at ¶ 231. Further, "[t]he touchstone of the analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting State v.Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940.
 {¶ 42} We note, at the outset, appellant did not raise claims of prosecutorial misconduct at trial. Under Ohio law, "[a] claim of prosecutorial misconduct is waived *Page 15 
unless raised at trial, and if so waived, can serve as the basis for relief only if the conduct constitutes plain error." State v.Franklin, 97 Ohio St.3d 1, 2002-Ohio-5304, at ¶ 24. In considering a claim of plain error, the relevant inquiry is whether, "but for the error, the outcome of the trial would have been different." Id.
 {¶ 43} Appellant's primary contention is that the state engaged in misconduct by calling former prosecutor Peterson to challenge alleged inconsistencies in King's testimony. The record indicates that, during King's testimony, the prosecution, out of the hearing of the jury, informed the court that aspects of King's testimony differed from statements he had given to prosecutors in 2005 as part of a proffer agreement signed by King and Peterson. Specifically, the prosecutor indicated that King's trial testimony, in which he denied knowledge of a planned robbery and also stated that appellant did not enter the apartment, differed from his proffer statements.
 {¶ 44} The trial court, at that point during the proceedings, declared King to be a witness of the court. The prosecution then questioned King about the proffer agreement he signed on January 20, 2005, and King denied stating at the time of the proffer that he agreed to drive to the apartment for the purpose of a robbery. He also denied telling prosecutors during the proffer that appellant entered the apartment.
 {¶ 45} Following King's testimony, the trial court gave an instruction to the jury regarding the fact King was confronted with some prior statements "that you may find were inconsistent with what he said here in the courtroom." (Tr. Vol. III, at 626.) The court instructed the jury in part that if the witness was confronted with a prior statement and he "denied the truth of that statement, you can't use the content of that statement, or the government can't use it to prove the charges against this man. However, you can *Page 16 
consider those prior inconsistent statements if you find them to be inconsistent to judge the credibility of this witness." (Tr. Vol. III, at 626.)
 {¶ 46} The state subsequently called Peterson to testify as to his recollection of the statements made during the January 20, 2005 proffer. At the time the proffer agreement was introduced, the trial court sought assurances from the prosecution that the statements were to be used "for impeachment only," and that "[t]here is no theory under which this is substantive evidence." (Tr. Vol. IV, at 669.) The prosecutor represented that the agreement was sought to be admitted for impeachment purposes only. The trial court asked defense counsel if "you agree with that," and counsel responded, "I do." (Tr. Vol. IV, at 669.)
 {¶ 47} The trial court again instructed the jury that it could "only consider these statements to judge the credibility of Mr. Justin King," and that it "cannot use these statements that he made back then as substantive proof of anything in the statement." (Tr. Vol. IV, at 669.) A similar instruction was again provided by the trial court during its general instructions, in which the court cautioned the jury that it could not use King's "out-of-court statements as proof against the Defendant." (Tr. Vol. IV, at 837.)
 {¶ 48} In general, "prior inconsistent statements constitute hearsay evidence and, therefore, are admissible only for impeachment purposes."State v. Kraus, Warren App. No. CA2006-10-114, 2007-Ohio-6027, at ¶ 18. Evid. R. 607(A) states: "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Evid. R. 607, however, "does not apply when the trial court calls the witness pursuant to Evid. R. 614." Kraus, supra, *Page 17 
at ¶ 19. As noted above, in the instant case, the trial court declared King the court's own witness, and defense counsel did not object to the trial court's decision to call this witness pursuant to Evid. R. 614.
 {¶ 49} Evid. R. 613(B) allows for the introduction of extrinsic evidence of a prior inconsistent statement of a witness, but a proper foundation must be laid prior to the admission of such evidence.State v. Darkenwald, Cuyahoga App. No. 83440, 2004-Ohio-2693, at ¶ 33. Specifically, when extrinsic evidence of a prior inconsistent statement is offered into evidence under Evid. R. 613(B), the proper foundation is established through direct or cross-examination where: "`(1) the witness is presented with the former statement; (2) the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement.'"State v. Mack (1995), 73 Ohio St.3d 502, 515, quoting State v.Theuring (1988), 46 Ohio App.3d 152, 155.
 {¶ 50} In the present case, the record indicates that the prosecutor laid the proper foundation to question King about statements he made during the proffer agreement. As noted, the prosecutor questioned King about his proffer statements and, contrary to his trial testimony, King denied stating that he knew a robbery was going to take place or that appellant entered the apartment. Defense counsel then cross-examined King about the proffer agreement. Following King's testimony, the state called Peterson, who testified that, during the proffer conversation, King stated "from the very beginning that the purpose for going ultimately to Mr. Goins['] house was for a robbery." (Tr. Vol. IV, at 670.) According to Peterson, King also stated during the proffer that appellant and Perry both *Page 18 
entered the house, "the door had closed, and * * * some time * * * passed, and that is what motivated him [King] to get out of the car and approach the apartment." (Tr. IV, at 674.)
 {¶ 51} Here, the requirements of Evid. R. 613(B) were met, and appellant has not shown that the evidence at issue was inadmissible to impeach King. Because there was no error, plain or otherwise, in the trial court's admission of Peterson's testimony, appellant cannot demonstrate prosecutorial misconduct as a result of the state calling this witness. Further, we find unpersuasive appellant's contention that this evidence should have been inadmissible under Evid. R. 403(A). While no objection was made under Evid. R. 403, as noted above, the trial court, on three separate occasions, gave the jury a limiting instruction that the statements regarding the January 2005 agreement were for impeachment purposes only and could not be used as substantive evidence of appellant's guilt.
 {¶ 52} Finally, to the extent appellant challenges the testimony of Detective Brooks regarding testimony about gang-related activity, we have found, in addressing the previous assignment of error, that the testimony of this witness was relevant and admissible. It is not prosecutorial misconduct to present admissible evidence.
 {¶ 53} Based upon the foregoing, appellant's first assignment of error is not well-taken and is overruled.
 {¶ 54} Under his third assignment of error, appellant contends that his trial counsel was ineffective in failing to: (1) waive trial by jury as to the gang count and specifications; (2) request a severance of the gang count and specifications; (3) file a motion in limine or motion to suppress the gang testimony; (4) timely and adequately object to prosecutorial *Page 19 
misconduct occurring throughout the trial; and (5) timely and adequately object to trial court errors occurring throughout the trial. Appellant further contends that he was prejudiced by his trial counsel's conduct, and that the cumulative effect of the errors and omissions denied him a fair trial.
 {¶ 55} In order to obtain reversal of a conviction based upon ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, which requires the defendant to "show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." State v. Conway, 109 Ohio St.3d 412,2006-Ohio-2815, at ¶ 95. In order to prevail on a claim of ineffective assistance of counsel in a case involving a failure to make a motion on behalf of a defendant, the defendant must show "(1) that the motion * * * thereto was meritorious, and (2) that there was a reasonable probability that the verdict would have been different had the motion been made[.]" State v. Lawhorn, Paulding App. No. 11-04-19,2005-Ohio-2776, at ¶ 35.
 {¶ 56} As to appellant's contention that his counsel could have kept prejudicial gang testimony from the jury by waiving his right to a trial by jury as to the gang count and gang specifications, we agree with the state that any discussions between counsel and appellant regarding a jury waiver are not part of the record on appeal. Further, this court has previously held that "[d]ecisions regarding a jury waiver can be readily explained in terms of trial strategy." State v. Stith (June 11, 1996), Franklin App. No. 95APA07-934.
 {¶ 57} The state also argues that, even in the absence of the gang specifications and the charge of participating in a gang, evidence of gang-related activity would have *Page 20 
been admissible to show the relationship between Perry, King and appellant, a key fact in showing appellant's complicity, and that such evidence was also relevant to put the crimes in context and to show motive or common purpose. Based upon our discussion of the admission of gang-related testimony in addressing the second assignment of error, we agree. See Dawson, supra (evidence of gang affiliation "not `other acts' evidence proscribed by Evid. R. 404(B)" but, rather, relevant to show common purpose, where appellant was prosecuted under complicity theory). See, also, State v. Robb (2000), 88 Ohio St.3d 59, 70-71 (evidence of defendant's membership in gang relevant to show he used status to commit crimes by complicity); Drummond, supra, at ¶ 112 ("Gang affiliation can be relevant in cases in which the interrelationship between people is a central issue").
 {¶ 58} Appellant next contends that his counsel was ineffective in failing to file a motion to bifurcate the count charging him with participating in a gang as well as the gang specifications. Ohio law, however, favors the joinder of multiple offenses in a single trial under Crim. R. 8(A). State v. Trammell (Feb. 1, 1999), Stark App. No. 1998CA00026. A defendant must affirmatively demonstrate prejudice from a court's decision not to sever charges. State v. Coleman (1999),85 Ohio St.3d 129, 136. A criminal defendant's claim of prejudice is negated when: "(1) evidence of the other crimes would have been admissible as `other acts' evidence under Evid. R. 404(B); or (2) evidence of each crime joined at trial is simple and direct." State v. Gilbert, Cuyahoga App. No. 86773, 2006-Ohio-3595, at ¶ 22.
 {¶ 59} In the present case, had counsel made a motion for severance, the trial court could have properly denied such motion. As noted above, the challenged evidence was admissible to show the relationship between appellant and the other individuals, as *Page 21 
well as relevant to put the crimes in context and to show motive or common purpose. Accordingly, because the trial court would not have abused its discretion by denying a motion for severance, appellant cannot demonstrate prejudice. Coleman, supra, at 136 (appellant unable to show prejudice, and, thus, not demonstrate ineffective assistance of counsel, where trial court could have properly denied a motion to sever had one been made).
 {¶ 60} Appellant's contention that his counsel was ineffective in failing to file a motion in limine to exclude the testimony of Detective Brooks regarding gang-related testimony is unpersuasive. Appellant reiterates his contention that such testimony failed to satisfy the requirements of Daubert, supra. As previously discussed, the testimony of Detective Brooks was not subject to the requirements ofDaubert. See Drummond, supra.
 {¶ 61} Appellant also argues that his trial counsel was ineffective in failing to raise prosecutorial misconduct objections regarding the testimony of Peterson and Detective Brooks. We have already determined, however, that the admission of this testimony did not constitute prosecutorial misconduct, and, therefore, appellant can demonstrate neither deficient performance nor prejudice by his trial counsel as to those issues.
 {¶ 62} Based upon the foregoing, appellant's third assignment of error is without merit and is overruled.
 {¶ 63} Under his fourth assignment of error, appellant asserts there was insufficient evidence to support his convictions. Appellant also contends the convictions were against the manifest weight of the evidence. *Page 22 
 {¶ 64} In State v. Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617, at ¶ 30-31, this court noted the distinction between sufficiency and manifest weight arguments, holding in relevant part:
 To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proved beyond a reasonable doubt. * * * Sufficiency is a test of adequacy, a question of law. * * * We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. * * * We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. * * * A conviction based upon legally insufficient evidence amounts to a denial of due process, * * *; and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant. * * *
 A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. * * * Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. * * * Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * *
(Citations omitted.) *Page 23 
 {¶ 65} The elements of felony murder under R.C. 2903.02(B) are: "(1) cause; (2) the death of another; (3) as a proximate result of the offender's committing or attempting to commit; and (4) an offense of violence that is a felony of the first or second degree and that is not a violation of R.C. 2903.03 (voluntary manslaughter) or R.C. 2903.04
(involuntary manslaughter)." Sexton, supra, at ¶ 38.
 {¶ 66} R.C. 2911.11(A), which sets forth the offense of aggravated burglary, provides:
 No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.
 {¶ 67} Ohio's aggravated robbery statute, R.C. 2911.01(A), states as follows:
 No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
 (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
 (3) Inflict, or attempt to inflict, serious physical harm on another. *Page 24 
 {¶ 68} In the instant case, the trial court instructed the jury on the law regarding complicity and conspiracy. In order to support a conviction for complicity by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."State v. Johnson (2001), 93 Ohio St.3d 240, 245-246. Under Ohio law, "`[participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" Id., at 245, quoting State v. Pruett (1971), 28 Ohio App.2d 29, 34.
 {¶ 69} Pursuant to Ohio's conspiracy statute, R.C. 2923.01(A)(1), "a conspiracy exists where an individual, along with another person or persons, `plan[s] or aid[s] in planning' certain specified offenses, including kidnapping [and] aggravated robbery." State v.Fitzgerald, Summit App. No. 23072, 2007-Ohio-701, at ¶ 20. Further, "R.C. 2923.01(B) requires that an individual must commit a `substantial overt act in furtherance of the * * * conspiracy' in order to be convicted of conspiracy and defines an act as substantial and overt when it `manifests a purpose on the part of the actor that the conspiracy should be completed.'" Id.
 {¶ 70} In considering appellant's sufficiency argument regarding evidence as to the above offenses, the state presented evidence that appellant, King and Perry discussed planning to do a "lick," or robbery, of Goins, under the pretense they were going to purchase marijuana from him. Payne made arrangements to meet with Goins at his apartment, and Payne, appellant, King and Perry drove there in two separate vehicles. Payne entered the apartment alone to speak with Goins, with Payne intending to then bring Goins outside to introduce him to appellant. *Page 25 
 {¶ 71} Perry and appellant, however, burst into the apartment; Perry was wielding a gun, and appellant grabbed a baseball bat and began waiving it at Goins. At first, Goins attempted to charge at Perry but he backed off after Perry pointed the weapon at him. Perry ordered Payne to lay face down on the floor, and appellant continued to hold the bat toward Goins, who sat on a couch. When Perry went into the kitchen area where the drugs were located, Goins ran for the door, but appellant attempted to block him. Goins was able to get outside, but appellant and Perry chased after him, and Perry shot Goins in the back of the head. Goins died almost immediately from the wound.
 {¶ 72} Appellant, Perry and King then fled from the scene, with Perry carrying a brown bag as they left the apartment. Later that evening, appellant offered Payne half the drugs taken from the apartment in order to ensure he would not contact the police. The next day, appellant offered Payne $10,000 not to speak to the police. The state also presented evidence that the bullet fragment recovered from the victim was fired by a weapon subsequently recovered from Perry's residence.
 {¶ 73} Construing the evidence most strongly in favor of the state, as we are required to do in considering a sufficiency argument, a rational trier of fact could have reasonably concluded that appellant aided and abetted in the aggravated robbery and aggravated burglary of Goins that resulted in the victim's death. Accordingly, we reject appellant's contention that there was insufficient evidence to support the convictions for aggravated robbery, aggravated burglary and murder.
 {¶ 74} Appellant was also charged with one count of participating in criminal gang activity, in violation of R.C. 2923.42(A), which provides: *Page 26 
 No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.
 {¶ 75} A "criminal gang" is defined under R.C. 2923.41 (A) to mean:
 * * * [A]n ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:
 (1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.
 (2) It has a common name or one or more common, identifying signs, symbols, or colors.
 (3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.
 {¶ 76} R.C. 2923.41(B) states:
 (1) "Pattern of criminal gang activity" means, subject to division (B)(2) of this section, that persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more of any of the following offenses:
 (a) A felony or an act committed by a juvenile that would be a felony if committed by an adult;
 (b) An offense of violence or an act committed by a juvenile that would be an offense of violence if committed by an adult;
 (c) A violation of section 2907.04, 2909.06, 2911.211 [2911.21.1], 2917.04, 2919.23, or 2919.24 of the Revised Code, section 2921.04 or 2923.16 of the Revised Code, *Page 27 
section 2925.03 of the Revised Code if the offense is trafficking in mari[j]uana, or section 2927.12 of the Revised Code.
 (2) There is a "pattern of criminal gang activity" if all of the following apply with respect to the offenses that are listed in division (B)(1)(a), (b), or (c) of this section and that persons in the criminal gang committed, attempted to commit, conspired to commit, were in complicity in committing, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in committing:
 (a) At least one of the two or more offenses is a felony.
 (b) At least one of those two or more offenses occurs on or after January 1, 1999.
 (c) The last of those two or more offenses occurs within five years after at least one of those offenses.
 (d) The two or more offenses are committed on separate occasions or by two or more persons.
 {¶ 77} Pursuant to R.C. 2923.41(C), "criminal conduct" is defined to mean "the commission of * * * complicity in the commission of * * * an offense listed in division (B)(1)(a), (b) or (c) * * *." The enumerated offenses under R.C. 2923.41(B)(1) include either a felony (R.C. 2923.41[B][1][a]) or an offense of violence (R.C. 2923.41[B][1][b]).
 {¶ 78} Appellant's indictment also included gang specifications under R.C. 2941.142, and that statute states in part:
 (A) Imposition of a mandatory prison term of one, two, or three years pursuant to division (I) of section 2929.14 of the Revised Code upon an offender who committed a felony that is an offense of violence while participating in a criminal gang is precluded unless the indictment, count in the indictment, or information charging the felony specifies that the offender committed the felony that is an offense of violence while participating in a criminal gang.
 * * * *Page 28 
 (C) As used in this section, "criminal gang" has the same meaning as in section 2923.41 of the Revised Code.
 {¶ 79} At trial, Detective Brooks testified that the Deuce Deuce Bloods is a street gang with over 100 members. The gang has certain identifying factors, including clothing and colors. Detective Brooks testified that appellant, King and Perry were all members of the Deuce Deuce Bloods gang. The detective had observed appellant wearing gang colors "many times." (Tr. Vol. IV, at 707.) Former Prosecutor Peterson was present when appellant admitted in court to being part of a gang. Detective Brooks identified photographs of appellant wearing gang attire/colors, and the detective testified as to his personal observation of appellant in the presence of other known gang members.
 {¶ 80} The detective further testified that the gang engages in a number of criminal activities, including "kidnapping * * * selling crack cocaine, marijuana, heroin [and] weapons charges." (Tr. Vol. IV, at 702-703.) He stated that an entire gang can benefit from just two or three individuals committing a crime, as money from the crimes can be used to pay for drugs, hire legal counsel, or assist family members when individuals are in prison. In this respect, Detective Brooks testified about a meeting of gang members appellant attended at the home of King, in which a confidential informant was wired for surveillance. According to the detective, the purpose of the meeting was to "rally the gang around those who were incarcerated, intimidate witnesses, [and] to get money together to help out family and to help for attorneys." (Tr. Vol. IV, at 716.) During that meeting, the members discussed retaliating against witnesses who were to testify against a particular gang member. *Page 29 
 {¶ 81} As to the charge of participating in a criminal gang, there was evidence which, if construed most strongly in favor of the state, indicated that appellant actively participated in a criminal gang, that he had knowledge that the gang engages in a pattern of criminal activity, and that he purposely assisted in "criminal conduct" or engaged in an act that constitutes "criminal conduct" as enumerated under the statute, by acting in complicity with other gang members, King and Perry, in the aggravated robbery and burglary of Goins, resulting in the victim's death. Further, there was evidence upon which the trier of fact could have found, in considering the gang enhancement/specification under R.C. 2941.142, that appellant committed an offense of violence while participating in a criminal gang.
 {¶ 82} In asserting that his convictions are against the manifest weight of the evidence, appellant maintains that evidence he aided and abetted Perry in the robbery and shooting of Goins was unreliable. Specifically, appellant contends the testimony of Payne was not credible, and that the "recollections" of former prosecutor Peterson were unsupported. Appellant also argues that the testimony of Detective Brooks was prejudicial.
 {¶ 83} Appellant first challenges the credibility of Payne, asserting that his testimony was at times incredible, and that he had a motive to lie. However, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury in this case heard Payne acknowledge that he sold drugs, and that he told police officers varying stories about the events. Payne offered explanations as to why he was not initially candid with the police, and defense counsel cross-examined him about those *Page 30 
matters, and assailed his credibility during closing argument. Here, the jury was free to assess the credibility of this witness, and to believe some, all or none of his testimony. State v. Sevilla, Franklin App. No. 06AP-954, 2007-Ohio-2789, at ¶ 13 (trier of fact is free to believe or disbelieve all or any of the testimony and is in the best position to take into account inconsistencies, as well as the witnesses' manner and demeanor, and to determine whether the testimony is credible). In light of the verdicts, the jury obviously found at least portions of Payne's testimony credible, and, based upon this court's review, we are not persuaded that Payne's testimony was so lacking in credibility as to justify setting aside the verdicts.
 {¶ 84} Regarding appellant's challenge as to Peterson's "recollection" of the proffer interview, the jury could have reasonably determined that his memory of that event was accurate. We note that the record does not suggest Peterson was unsure about his ability to recall King's proffer responses, and the fact Peterson did not take notes during the interview did not require the jury to reject his testimony. Finally, for reasons previously discussed, we find no merit to appellant's contention that the jury was misled by the prejudicial effect of gang-related testimony from Detective Brooks.
 {¶ 85} Based upon this court's review of the record, we do not find that the jury, in resolving conflicts and assessing the credibility of witnesses, lost its way and created a manifest miscarriage of justice such that the convictions must be reversed and a new trial granted. We therefore find no merit to appellant's contention that his convictions were against the manifest weight of the evidence.
 {¶ 86} Accordingly, appellant's fourth assignment of error is without merit and is overruled. *Page 31 
 {¶ 87} Based upon the foregoing, appellant's first, second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
FRENCH and DESHLER, JJ., concur.
 DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1